2021 IL App (2d) 190887-U
No. 2-19-0887
Order filed September 24, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-1748 |
| | ) | |
| ANTONIO J. COLLINS, | ) ) | Honorable Kathryn D. Karayannis, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Bridges and Justice Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion  when it admitted evidence of a prior domestic violence incident involving the same victim. The trial court erred when it limited defendant's closing argument and permitted the State to use hearsay testimony substantively in its closing argument, but these errors were harmless. Affirmed.

¶ 2    Defendant, Antonio J. Collins, was convicted of four counts stemming from an allegation of domestic violence against his former girlfriend, Daisy Manrriquez, occurring on August 27, 2018: (1) domestic battery (bodily harm) (720 ILCS 5/12-3.2(a)(1) (West 2018)), (2) domestic battery (insulting or provoking contact) (720 ILCS 5/12-3.2(a)(2) (West 2018)), (3) aggravated

domestic battery/strangulation (bodily harm) (720 ILCS 5/12-3.3(a-5) (West 2018)), and (4) aggravated domestic battery/strangulation (insulting or provoking contact) (720 ILCS 5/12-3.3(a-5) (West 2018)). The trial court merged three of the counts into the fourth, and defendant was sentenced to three years' imprisonment followed by four years' mandatory supervised release.

¶ 3    On appeal, defendant claims the trial court erred when it (1) permitted the State to introduce evidence of a prior domestic violence incident involving defendant, (2) barred defendant from commenting during closing argument on an open child custody case between defendant and Manrriquez, and (3) permitted the State to introduce out-of-court statements by the victim over defendant's hearsay objection and use those statements in closing argument for the truth of the matter asserted. We conclude that the trial court did not err in admitting evidence of a prior domestic violence incident. The court did err when it restricted defendant's closing argument and when it allowed the State to use hearsay testimony substantively, but these errors were harmless. Accordingly, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    The State charged defendant with seventeen counts arising out of four distinct incidents of domestic violence that allegedly occurred between August 25 and 27, 2018. The charging instrument reflects that two separate incidents allegedly occurred on August 27, 2018—one in the afternoon and one in the evening. For each incident, the State charged defendant with the following: (1) aggravated domestic battery (bodily harm) alleging strangulation (720 ILCS 5/12-3.3(a-5) (West 2018)) (counts I, III, V, and VII); (2) aggravated domestic battery (insulting or provoking contact) alleging strangulation (720 ILCS 5/12-3.3(a-5) (West 2018)) (counts II, IV, VI, and VIII); (3) domestic battery (bodily harm) (720 ILCS 5/12-3.2(a)(1) (West 2018)) (counts IX, XI, XIII, and XV); and (4) domestic battery (insulting or provoking contact) (720 ILCS 5/12-

3.2(a)(1) (West 2018)) (counts X, XII, XIV, and XVI). The State also charged defendant with a fifth count of domestic battery (insulting or provoking contact) (720 ILCS 5/12-3.2(a)(1) (West 2018) (count 17) and with child endangerment (720 ILCS 5/12C-5(a)(2) (West 2018) (count 18) alleging that defendant knowingly struck his son, A.C., on August 27, 2018.

¶ 6                                    A. The State's Motion *in Limine*

¶ 7     The State filed a motion *in limine* seeking to introduce, pursuant to sections 115-7.4 and 115-20 of the Code of Criminal Procedure of 1963 (Code) (720 ILCS 5/115-7.4, 115-20 (West 2018)), evidence of two prior incidents of domestic violence involving defendant: (1) a 2014 incident involving Manrriquez and (2) a July 2018 incident involving Rachel Riemer. Defendant opposed the motion, arguing that evidence of both incidents should be barred as overly prejudicial under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). The trial court ultimately granted the State's motion in part, ruling that evidence of the 2014 incident, but not the July 2018 incident, was admissible. The court stated that the 2014 incident was not "too remote" and noted that it involved the same victim and similar conduct.

¶ 8                                    B. The Trial

¶ 9     The case proceeded to a jury trial in May 2019. We recount the evidence relevant to this appeal.

¶ 10                                   1. Daisy Manrriquez

¶ 11    The State called Manrriquez as its first witness. Manrriquez testified as follows. On August 25, 2018, she lived in an Elgin apartment with her son, A.C. At that time, Manrriquez was dating defendant (A.C.'s father) and both defendant and his friend, Donald Harris, were staying with Manrriquez.

¶ 12    When defendant returned to Manrriquez's apartment on August 25, 2018, the pair had an argument. Defendant appeared mad and "[h]e looked drunk." While arguing in Manrriquez's bedroom, defendant got on top of her, choked her, slapped her, and "tried to take [her] eye out." The whole incident lasted 15 to 20 minutes, and Manrriquez was unable to breathe for approximately 45 seconds while defendant was choking her. Defendant also grabbed Manrriquez's hands and repeatedly hit her with her own hands.

¶ 13    On August 26, 2018, defendant and Manrriquez argued again in her bedroom. Defendant grabbed her by the neck and choked her, and Manrriquez was unable to breathe for approximately 25 seconds. He then dragged her by her legs off the bed, causing Manrriquez to hit her head on the corner of a dresser. Harris was in another room of the apartment at the time and Manrriquez screamed for his help, prompting Harris to tell defendant, "Bro, get off that girl, your son is right there."

¶ 14    On August 27, 2018, defendant and Manrriquez argued at approximately 5 p.m. Manrriquez was locked out of her apartment because defendant had her keys and refused to immediately return them. He returned at approximately 8 p.m., at which point the pair continued arguing and defendant refused to return Manrriquez's keys. He tried to drive away, so Manrriquez jumped into the rear seat of the car with her legs hanging out to prevent him from leaving. Defendant got out of the driver's seat, slammed the car door into Manrriquez's legs, and threw Manrriquez's keys into the grass. She attempted to run inside and upstairs to her apartment, but defendant stopped her. He grabbed Manrriquez by the mouth and neck, interrupting her breathing, and slammed her into the ground. Defendant then dragged Manrriquez by her hair into the rear seat of the car and drove off with her in the car for approximately 16 minutes before letting her

out. Manrriquez testified that she was on the phone with her best friend, Bianca Young, throughout the altercation and that Young "heard everything."

¶ 15 Manrriquez described a second altercation on August 27, 2018. Manrriquez was on the floor of her room with A.C. on top of her when defendant hit A.C., blamed Manrriquez, and started slapping her and shaking her forcefully.

¶ 16 The State introduced and published two sets of photos depicting Manrriquez's injuries: one set taken on August 28, 2018, at the Elgin police department and another set taken approximately two days later in Manrriquez's car. Manrriquez described her injuries, including cuts and bruising on her mouth, neck, arm, leg, chest, and hand. The State asked Manrriquez about a 2014 incident involving her and defendant. Defendant pushed Manrriquez during an argument in the home they shared at the time, causing her to fall and hit her head. Manrriquez also testified that, in August 2018, there was an ongoing civil case between her and defendant involving child support and visitation, and acknowledged that, on August 28, 2018, she gave a written statement to Elgin police officers and submitted a petition for an order of protection against defendant.

¶ 17 On cross-examination, defense counsel impeached Manrriquez about discrepancies between her trial testimony and two written statements she provided after reporting defendant's conduct to police. The line of questioning primarily focused on details present in either the written statements or in Manrriquez's testimony, but not both. For example, Manrriquez wrote in one of her statements that she and defendant began arguing on August 25, 2018, after Rachel Riemer called her, but she did not volunteer this information during direct examination. And while she testified that defendant caused her to stop breathing for 45 seconds during that day's altercation, this detail was not included in one of the written statements. Manrriquez frequently answered that she could not remember in response to questions about specific details regarding the alleged

offenses or her written statements. Finally, Manrriquez acknowledged that she was seeking custody of A.C. in the civil case and that she had discussed the case with police.

¶ 18                                    2. Bianca Young

¶ 19     Bianca Young testified for the State. She explained that she had known Manrriquez, her best friend, for four to five years and that she had spoken with defendant several times prior to August 27, 2018. On that day, she received a call from Manrriquez that lasted "[a]lmost an hour."

¶ 20     During the call, Young heard an "altercation" and "caught a little bit of something." Defendant sounded "[a]ngered" and was using profanity. The State asked Young to further describe what she heard; Young responded that she heard Manrriquez say, "Give me back my keys. Don't punch me. Don't kick me. Don't hit me." Defense counsel objected on hearsay grounds, but the trial court overruled the objection without argument. Based on this call, Young notified the police. Young also testified that Manrriquez had a reputation in the Elgin community for honesty.

¶ 21                                    3. Donald Harris

¶ 22     Defendant called Harris to testify. Harris considered defendant to be like a brother and stayed with defendant at Manrriquez's house for "[a]lmost a week" during August 2018, including the dates of August 25-27, 2018. He slept in the living room on the couch.

¶ 23     On August 25, 2018, Harris went to Mariano's with defendant, Manrriquez, and Manrriquez's children to buy groceries. He did not see any fighting or inappropriate pushing or touching, and he did not hear Manrriquez yell out. Specifically, he did not see defendant strike or push Manrriquez on August 25.

¶ 24     On August 26, 2018, Harris spent the entire day with defendant. Around noon, Harris, defendant, Manrriquez, and Manrriquez's children went to Lords Park Zoo. Later, the group went

to a restaurant for burritos. There, defendant and Manrriquez verbally argued in the car for approximately 15 minutes. They returned to Manrriquez's apartment and watched movies.

¶ 25   At approximately midnight, Manrriquez's ex-boyfriend, Byron Williams, appeared at Manrriquez's door. Manrriquez and Williams exchanged words for "[a]bout a minute and a half"; Williams "was getting angry" and wanted to enter the apartment to punch Harris, who was on the couch next to the front door. Williams did not enter the apartment, but he grabbed Manrriquez by the wrist and throat, forcefully pulled her into the hallway, and dragged her down the stairs. Manrriquez's leg got caught under her.

¶ 26   Defendant had been in bed when Williams arrived but woke up while Manrriquez was being dragged. He entered the living room but did not intervene. He told Harris, "That's between them. I'm not finin to get mixed up into their business."

¶ 27   Harris had not seen any injuries to Manrriquez on August 25, despite observing her from a distance of, at most, two feet "15 times." After the Williams incident, Harris noticed a bruise on Manrriquez's right knee for the first time.

¶ 28   On August 27, 2018, Harris spent the morning at Manrriquez's apartment but did not hear any yelling or see any physical contact between defendant and Manrriquez. That evening, Harris went with defendant to pick up Rachel Riemer. After dropping her off, Harris and defendant returned to Manrriquez's apartment at approximately 9:00 or 9:30 p.m. Manrriquez met them in the parking lot and appeared frustrated. She told defendant to return her keys. Defendant complied, but Manrriquez threatened to tell the police that defendant beat her. Defendant stated, "I'm not finin to go to jail for something I didn't do" and prepared to drive away. Manrriquez jumped in the back seat and threw her keys to Harris, telling him to take her children upstairs. Harris got upstairs at approximately 9:45 p.m. and saw defendant drive off with Manrriquez in the car.

Manrriquez returned at approximately 9:55 p.m. and "she was somewhat pissed." She told Harris she had called the police. Standing six inches away, Harris observed that Manrriquez "had no marks, no redness, no bruising" on her face.

¶ 29    Finally, Harris was shown various previously-admitted photographs depicting Manrriquez's injuries. With respect to the injuries Harris had previously observed, he testified that the first time he saw them was either on August 26, 2018, after Williams left the apartment, or the following day.

¶ 30    On cross-examination, Harris acknowledged that he had previously told investigators that he had gone to a rib restaurant for dinner on August 25, 2018. He agreed that he had previously told defense counsel that Williams came to Manrriquez's apartment at approximately 10 p.m. on August 26, 2018, rather than midnight. Harris also acknowledged that, even though police arrived at the apartment on the evening of August 26, 2018, he did not tell the police about Williams until after defendant was arrested.

¶ 31                                    4. Other Evidence

¶ 32    Defendant did not testify. After the defense rested, the State presented its rebuttal case.

¶ 33    Tracie Newcomer testified that she spoke with Harris in person in October 2018 and via phone in December 2018. They discussed Manrriquez's allegations against defendant. Newcomer acknowledged that some of the details from Harris's testimony were not discussed when they spoke.

¶ 34    Elgin Police Officer Greg Lynch testified that on the evening of August 27, 2018, he spoke with Harris at Manrriquez's apartment. His interaction with Harris was captured on his body camera and a redacted video was admitted and published for impeachment purposes.

¶ 35   Finally, at the close of its rebuttal case, the State introduced and published a stipulation. The parties stipulated that, if defense counsel were called to testify, he would testify to the following based on an April 5, 2019, conversation with Harris. First, Harris told counsel that (1) on August 26, 2018, Williams was yelling after he came into the apartment; (2) Williams grabbed Manrriquez's leg and pulled her down the stairs that day; (3) he saw minor bruises after Williams was at Manrriquez's apartment that day; (4) he, defendant, Manrriquez, and Manrriquez's children played basketball at Lord's Park at noon on August 27, 2018; and (5) he did not see any bruises, cuts, or marks on Manrriquez on August 27, 2018. Second, Harris never told counsel that (1) he saw and heard defendant and Manrriquez have a verbal argument on August 26, 2018, in the parking lot of the burrito place; (2) he saw bruising on Manrriquez's right knee on August 26, 2018, after her altercation with Williams; or (3) Manrriquez stormed back into the house after defendant dropped her off on August 27, 2018. Further, counsel could not recall whether Harris related that (1) Williams pushed his way into Manrriquez's apartment on August 26, 2018; (2) Williams grabbed Manrriquez by her wrist; (3) defendant stormed out of the room after the altercation between Williams and Manrriquez; or (4) defendant said on August 27, 2018, that he was not going to go to jail for something he did not do.

¶ 36                                5. Closing Arguments

¶ 37   Defendant's closing argument largely focused on Manrriquez's credibility. Defense counsel began by reminding the jury that "[the State's] whole case rests on Daisy Manrriquez" and reiterated: "I told you when we first started about vengeance. She was furious. She was wrath. She was vengeance. Daisy Manrriquez was out for revenge."

¶ 38   Continuing this theme, defense counsel directed the jury's attention to the ongoing child custody case between defendant and Manrriquez, but was interrupted by the State's objection:

"[MR. FEDA (DEFENSE ATTORNEY):] And she told you there was a family law case going on. Long before this, there was a family law case going on. Could this affect that? Could what happens here today affect that?

MS. GERDING [(ASSISTANT STATE'S ATTORNEY)]: Your Honor, I would object and ask to strike that.

THE COURT: That objection is sustained. That portion—that statement in the closing argument will be stricken. The jury will be ordered to disregard that statement.

MR. FEDA: May I ask why?

THE COURT: No. Just keep going."

The trial court did not provide the basis for its ruling.

¶ 39    Despite the trial court's limitation on defense counsel's reference to the child custody case, the court later overruled defendant's objection to the State's reference to that case during its rebuttal argument:

"[MS. GERDING:] The order of protection in the child custody case. Well, of course, Ms. Manrriquez is going to want custody of her child. Any reasonable person would after someone else attacked them in the presence of their child and struck the child in the process.

MR. FEDA: Objection.

THE COURT: Overruled."

¶ 40    Also pertinent to this appeal is the State's use of Young's testimony during its rebuttal argument. The State argued that Young's recitation of what she heard while on the phone with Manrriquez provided substantive evidence that defendant committed the charged conduct:

- 10 -

"[MS. GERDING:] Now, the third way we know that the defendant beat and strangled Daisy is Bianca. Yes, Bianca is Daisy's friend, but Bianca didn't witness or claim to witness that she observed any of this happen with her own eyes. She overheard some things in the background when Daisy called her for help. For over an hour, Bianca heard the defendant cussing at Daisy, calling her a bitch. She heard the defendant refuse to give Daisy her keys back. She heard Daisy say, don't punch me; don't touch me; don't hit me. She heard what sounded to her like a fight, and this caused her enough concern to call the police."

¶ 41                                6. The Verdict

¶ 42    After closing arguments, the trial court entered a directed finding of not guilty on the count alleging domestic battery against A.C. The jury found defendant guilty on all counts relating to the evening of August 27, 2018, and not guilty on all other counts, including child endangerment.

¶ 43                           C. Post-Trial Proceedings

¶ 44    Defendant filed a lengthy motion for a new trial.[1] Relevant here, defendant argued that the trial court erred when it granted the State's motion *in limine* to admit evidence of the 2014 domestic violence incident; allowed Young to testify, over defendant's hearsay objection, about statements made by the victim, which the State then used substantively in closing; and sustained the State's objection to defense counsel's reference during closing argument to the pending child custody case between defendant and the victim. The court denied the motion.

---

[1] Defendant also filed a separate *pro se* motion for a new trial alleging ineffective assistance of counsel. Prior to the hearing on the motion filed by defense counsel, the trial court held a *Krankel* hearing and denied the *pro se* motion.

¶ 45    Following a sentencing hearing, defendant was sentenced to three years' imprisonment followed by four years' mandatory supervised release, with three of the counts merging into the fourth. This timely appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47    We begin by addressing defendant's argument that evidence of the 2014 incident involving Manrriquez was improperly admitted. Next, we consider whether the trial court erred by improperly limiting defendant's closing argument. Finally, we analyze whether the court erroneously permitted the State to use hearsay evidence substantively in its closing argument.

¶ 48               A. Admission of the 2014 Domestic Violence Incident

¶ 49    Defendant first argues that the trial court erred when it allowed the State to introduce evidence of the 2014 domestic violence incident involving defendant and Manrriquez. The State introduced testimony about the incident pursuant to section 115-7.4 of the Code, which provides, "In a criminal prosecution in which the defendant is accused of an offense of domestic violence ***, evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2018). Relevant evidence certainly may be excluded when the danger of unfair prejudice substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011). In performing this balancing function, courts may consider "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2018). A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 39. A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable. *Id.*

¶ 50    Here, the evidence adduced shows that there is sufficient similarity between the charged offenses and the 2014 incident to satisfy Rule 403. Defendant was charged with domestic battery against Manrriquez in 2014, although the charges were later dropped. That incident occurred at Manrriquez's residence in Carpentersville, Illinois.

¶ 51    Defendant argues that several factors make the incidents dissimilar. First, the incidents occurred in different towns. Second, the August 27, 2018, evening incident involved a car and occurred outside, while the 2014 incident occurred in a bedroom. Third, in 2014 defendant allegedly pushed Manrriquez, causing her to fall and hit her head, whereas the current charges alleged that he bruised her arms and wrists, hit her leg with a car door, and slammed her into the concrete.

¶ 52    That the incidents occurred in different towns is inconsequential. Both the 2014 incident and the 2018 incidents took place at Manrriquez's home, which is essentially the same location.

¶ 53    Defendant's focus on one of the four charged incidents—the August 27, 2018, evening incident—is also unavailing. While that incident involved a car and occurred outside, the other three incidents allegedly took place in Manrriquez's apartment, just as the 2014 incident allegedly did. More significant, that incident *is* factually similar to the 2014 incident. Manrriquez testified that, in June 2014, defendant pushed her to the ground, causing her to injure her head and mouth; and, on August 27, 2018, defendant slammed her into the ground, causing various injuries. An earlier incident need not "mirror the current charge," *Jackson*, 2014 IL App (1st) 123258, ¶ 43, and "the 'existence of some differences' between a charged offense and other-crimes evidence does not defeat the admissibility of the other-crimes evidence, because no two crimes are identical," *Ross*, 2018 IL App (2d) 161079, ¶ 173 (citing *People v. Donoho*, 204 Ill. 2d 159, 185 (2003)). The existence of some differences between the 2014 incident and the 2018 incidents do

not make admission of the 2014 incident substantially more prejudicial than probative, thus the trial court did not abuse its discretion.

¶ 54    Defendant also argues that the trial court failed to conduct any type of meaningful assessment to balance the probative value of the other-crimes evidence against the risk of undue prejudice. See *People v. Reber*, 2019 IL App (5th) 150439, ¶ 78 ("The meaningful assessment required by the trial court generally requires the trial court to discuss both the probative and undue prejudicial value of the evidence and then to weigh these two values."). This is belied by the court's determination that the 2014 incident was not "too remote" from the charged conduct and defendant's acknowledgement that the trial court specifically considered that the prior incident involved the same victim and similar conduct. See 725 ILCS 5/115-7.4(b) (West 2018) ("In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider: (1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances.")

¶ 55    Defendant asserts that the trial court failed to consider the emotional impact the prior incident would have on the jury or that evidence of a prior guilty plea would lead the jury to assume defendant was guilty. Initially, we note that evidence of the prior guilty plea was not admitted. As to the emotional impact on the jury, it is not clear, and defendant does not explain, what the extent of that impact would be. It is implicit in the nature of propensity evidence that it prejudices defendant's case, but defendant fails to explain how this evidence created a "danger of *unfair* prejudice" (emphasis added), see Ill. R. Evid. 403 (eff. Jan. 1, 2011), or how the trial court was expected to consider the alleged unfair prejudice when trial counsel did not raise these arguments. For these reasons, we reject defendant's argument.

¶ 56                    B. Limitation on Defendant's Closing Argument

¶ 57    Defendant next contends that the trial court erred by favoring the State during closing arguments. Specifically, he argues that the court allowed the State, but not defendant, to comment on the open child custody case between defendant and Manrriquez and to argue Manrriquez's motives. Defendant asserts that this constitutes an abuse of discretion. The standard of review for closing arguments appears unsettled. Compare *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*"), with *People v. Blue*, 189 Ill. 2d 99, 128, 724 N.E.2d 920, 935 (2000) (" 'The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion.' [Citation.]"). We reach the same conclusion under either standard: the trial court's disparate treatment of defendant was error.

¶ 58    Our conclusion is guided by several principles. Criminal defendants have a constitutional right to cross-examine witnesses on possible bias, interests, and motives to testify. U.S. Const., amends. VI, XIV; *People v. Eckert*, 194 Ill. App. 3d 667, 674 (1990). Concomitantly, defendants must be permitted to argue bias, interest, and motive at closing argument. We further recognize that, although "a total denial of the opportunity for final argument *** is a denial of the basic right of the accused to make his defense," a trial court has "great latitude" in limiting the scope of closing argument. *Herring v. New York*, 422 U.S. 853, 859, 862 (1975). Nevertheless, arguments based upon reasonable inferences drawn from the evidence are within the scope of proper closing. *People v. Edgeston*, 157 Ill. 2d 201, 219 (1993); *People v. Wilson*, 312 Ill. App. 3d 276, 287 (2000). It is error for a trial court to deny a defendant an adequate opportunity to present a closing argument. See *Wilson*, 312 Ill. App. 3d at 287 (concluding trial court erred when it instructed the jury on a theory of liability that the defense counsel had not had an opportunity to argue against during

closing argument); *People v. Heiman*, 286 Ill. App. 3d 102, 112 (1996) (concluding trial court improperly limited the defendant's closing argument when it argued with defense counsel and interrupted 40 to 50 times). Moreover, courts may not display favor toward either party by granting more leniency during closing argument. See *People v. Minter*, 2015 IL App (1st) 120958, ¶ 132.

¶ 59 Here, defendant does not contend that the trial court limited his ability to cross-examine Manrriquez concerning the custody case. Rather, he claims the court improperly denied him the opportunity to argue that the ongoing custody battle with defendant gave Manrriquez a motive to fabricate accusations of domestic violence against him. During closing argument, defense counsel referenced the custody case and posed a rhetorical question to the jury: "Could this affect that? Could what happens here today affect that?" The trial court sustained the State's objection. In so doing, the court did not provide the basis for its ruling, despite defense counsel's inquiry, "May I ask why?" The court responded, "No. Just keep going." The trial court then compounded this error when it allowed the State, over defendant's objection, to suggest that the child custody case was motivated by Manrriquez's desire to escape defendant's abuse.

¶ 60 The State argues that defendant's argument "was an attempt to ask the jury to consider what impact their verdict in this case would have on a completely separate irrelevant civil case," citing *People v. Meeker*, 86 Ill. App. 3d 162, 170 (1980) ("The jury's verdict should not be influenced by its possible consequences. [Citation.] Such an instruction invites the jury to reach a compromise verdict[.]"). The State acknowledges that argument about potential witness bias is proper, but contends that defendant's argument did not concern witness bias. The State's argument here is somewhat disingenuous. The State notes that defendant cross-examined Manrriquez about her motivations to testify, but fails to acknowledge that defendant was prevented by the State's objection from using this testimony to demonstrate Manrriquez's potential bias. Defense counsel's

reference to the civil case was entirely consistent with an argument about motive. Defense counsel was asking the jury rhetorically whether defendant's criminal trial might affect the civil case in which Manrriquez was seeking custody over defendant's child. The obvious implication is that Manrriquez was motivated to lie about defendant's conduct so that he would be convicted, thus enhancing her chances of winning custody of A.C.

¶ 61    The court erred on multiple levels. The court improperly sustained the State's objection to defendant's reference to the child custody case without allowing defense counsel to argue the propriety of his argument. It then allowed the State to do what it prohibited defendant from doing. Finally, in so limiting defendant, the court denied defendant the opportunity to present a theory of defense that was based upon a reasonable inference drawn from the evidence. While trial courts may be loath to interrupt the rhythm of a party's closing argument with side bars or the like, here defense counsel was seeking clarification during his own closing argument, and a brief colloquy would likely have avoided the instant error. This, however, did not occur and the sequence of events detailed above constitutes an abuse of discretion.

¶ 62    Defendant urges that this error warrants automatic reversal. A trial court may restrict a closing argument to such a degree that automatic reversal is required, regardless of whether the defendant is prejudiced. *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003) (citing *Herring*, 422 U.S. at 864) (concluding trial court committed reversible error when, during closing argument, the court repeatedly interrupted defense counsel, exhibited impatience in limiting counsel's time for argument, and made remarks demonstrating prejudgment); see also *United States v. Kellington*, 217 F.3d 1084, 1099-1100 (9th Cir. 2000) (concluding, in prosecution alleging defendant attorney obstructed justice during representation, that admonition to counsel not to make "ethics type of argument" in closing and instruction to jury that expert legal ethics testimony was " 'background'

information" violated defendant's right to present his theory of the case); *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 1999) (concluding trial court's refusal to allow defendant to argue that elements of charged offense were not met denied defendant right to present a defense).

¶ 63    The error here, however, does not warrant automatic reversal. Defendant was not functionally denied the opportunity to present a closing argument by a combative judge, *contra Stevens*, 338 Ill. App. 3d at 810; nor to argue that evidence showed he lacked requisite *mens rea*, *contra Kellington*, 217 F.3d at 1099-1100; nor to argue that the State did not satisfy an element of a charged offense, *contra Conde*, 198 F.3d at 739. Rather, defendant was denied the opportunity to argue specific evidence of bias, which would have gone to the credibility of a witness. Significantly, defendant's counsel argued in closing that Manrriquez was "out for revenge," that her delay in seeking out police assistance or medical attention following the alleged attacks made her version of events less credible, and that another person was responsible for her injuries. Defendant, thus, was able to argue that Manrriquez had a motive and opportunity to blame defendant for injuries that he did not cause, albeit not to the full extent he wished.

¶ 64    Based on the foregoing, we address the State's argument that the error was harmless and conclude that the trial court's error was harmless beyond a reasonable doubt. See *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (noting that State must show that constitutional errors are harmless beyond a reasonable doubt) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)); *People v. Cosme*, 247 Ill. App. 3d 420, 433 (1993) (State must show that error, considered in light of all the evidence, was not a material factor in the conviction, *i.e.* that the jury would have reached the same result without the error). The effect of the court's refusal to allow defense counsel to comment on the child custody case was minor in the context of the whole trial. Defendant was able to elicit testimony from Manrriquez about the ongoing custody dispute without objection, bringing it to the

jury's attention. The jury was thus capable of drawing its own inference about Manrriquez's motives, taking the custody dispute into consideration. As noted above, defendant was able to comment on Manrriquez's motives in other ways. And the jury had ample opportunity to gauge Manrriquez's credibility as her testimony formed the foundation of the charges against defendant.

¶ 65    Significantly, Harris's testimony was problematic in its own right. For instance, Harris testified that on August 26, 2018, Williams came to Manrriquez's apartment and dragged her outside while he and defendant stood by and did nothing to intervene. The jury, drawing on common sense, may have found this narrative incredible. Furthermore, the State impeached key parts of Harris's testimony. Harris acknowledged on cross-examination that, although he spoke to police the day after the alleged incident involving Williams, he did not tell police about Williams until after defendant was arrested. When he did discuss Williams with police, he told them that Williams had arrived around 10 p.m. on August 26, 2018, whereas he testified that Williams arrived around midnight. Defense counsel also stipulated that Harris told him Williams grabbed Manrriquez by the leg and pulled her down the stairs on August 26, 2018, which was inconsistent with his trial testimony that Williams dragged Manrriquez by her wrist and throat. These inconsistencies raised serious credibility issues which the jury was free to consider in weighing Harris's testimony.

¶ 66    Ultimately, we conclude that no reasonable jury would have rendered a different verdict based solely on the addition of the argument defendant wanted to make. The error was not a material factor in the conviction, thus the court's error was harmless.

¶ 67              C. The State's Substantive Use of Hearsay Evidence

¶ 68    Defendant last contends that the trial court erred when it overruled his hearsay objection to Bianca Young's testimony about what she heard Manrriquez say over the phone and allowed the

State to make substantive use of the statements during closing argument. Hearsay is an out-of-court statement offered for the truth of the matter asserted and is generally inadmissible. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); see also Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); R. 802 (eff. Jan. 1, 2011). When an objection to testimony is made on hearsay grounds, the trial court's ruling is reviewed for an abuse of discretion. *Caffey*, 205 Ill. 2d at 89. A trial court errs when it allows a party to use hearsay substantively in a closing argument and fails to provide a proper limiting instruction. See *People v. Walker*, 211 Ill. 2d 317, 343-45 (2004) (concluding that trial court erred by permitting State to argue in closing that prior out-of-court statement by witness "tells the truth" and failing to give limiting instruction). We agree that this happened here.

¶ 69    During its direct examination, the State asked Young about what she overheard while on the phone with Manrriquez on the evening of August 27, 2018. Young answered that, during an hour-long conversation, she heard Manrriquez say, "Give me back my keys. Don't punch me. Don't kick me. Don't hit me." Defendant objected on hearsay grounds, but the court overruled the objection. Young indicated that these statements prompted her to call the police. Later, during its closing argument, the State argued,

> "Now, the third way we know that the defendant beat and strangled Daisy is Bianca. ***. She heard the defendant refuse to give Daisy her keys back. She heard Daisy say, don't punch me; don't touch me; don't hit me. She heard what sounded to her like a fight, and this caused her enough concern to call the police."

The trial court provided no jury instruction regarding the use of Young's testimony.

¶ 70    Simply put, the State asked the jury to consider Young's testimony about Manrriquez's statements for the truth of the matter asserted—that is, as proof that "the defendant beat and strangled Daisy." The trial court's failure to give a limiting instruction after overruling defendant's

initial hearsay objection was error.

¶ 71    The State contends that defendant forfeited this argument by failing to contemporaneously object when the State made substantive use of the statements during closing argument. "To preserve an alleged error for review, a defendant must raise a timely objection at trial and raise the error in a written posttrial motion." *People v. Smith*, 2016 IL 119659, ¶ 38. Defendant disputes that he forfeited the argument, arguing that his objection to the introduction of the statements at trial preserved the error.  See Ill. R. Evid. 103(b)(2) (eff. Oct. 15, 2015) (a contemporaneous trial objection need not be renewed to preserve a claim of error for appeal). We note that while defendant's hearsay objection at the time of Young's trial testimony was overruled, the court did not ask the State for a response to the objection and provided no explanation for why the objection was overruled. Young, however, did subsequently testify that the overheard statements were the reason she called the police, which would be a non-hearsay basis for the statements' admission. See *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76 (statements offered to explain the listener's subsequent course of conduct not hearsay).  If this were the case, then the State's use of the hearsay statements as substantive evidence occurred for the first time at closing argument, and this would have been a new development that would have required a new objection to preserve the error for review.  *Smith*, 2016 IL 119659, ¶ 38.  Given the uncertainty as to whether the Young statements were used for hearsay purposes at trial, especially given their detail and the State's subsequent use of the same substantively at argument, we find that defendant's trial objection in conjunction with his posttrial motion was sufficient to preserve the error.

¶ 72    The State contends that even if the substantive use of Manrriquez's statements overheard by Young was error, the error was harmless. We agree.

¶ 73    To determine if an error was harmless beyond a reasonable doubt, reviewing courts may

consider the following factors: "(1) whether the error contributed to the defendant's conviction, (2) whether the other evidence in the case overwhelmingly supported the defendant's conviction, and (3) whether the challenged evidence was duplicative or cumulative." *People v. King*, 2020 IL 123926, ¶ 40 (applying harmless-beyond-a-reasonable-doubt standard to admission of expert testimony); but see *In re E.H.*, 224 Ill. 2d at 180 (noting that evidentiary errors are harmless if there is no reasonable probability that jury would have acquitted a defendant absent an error). The introduction of the statements in the first place was arguably proper given Young's explanation that they prompted her to call the police. Prejudice from the State's substantive use of Young's hearsay testimony in argument was minor in the context of the whole trial. The State's case rested primarily on Manrriquez's testimony and photographs depicting her injuries, so Young's testimony was not critical. Young's improper testimony was cumulative in that Manrriquez testified directly about what defendant was doing during the time period in which she spoke to Young on the phone. Moreover, Young testified that she did not witness the altercation.

¶ 74 Defendant insists that the error was not harmless because the trial rested largely on Manrriquez's credibility. The jury found defendant guilty only in relation to the incident occurring during the evening of August 27, 2018, and Young's improper testimony bolstered Manrriquez's testimony about that incident. Thus, defendant suggests that bolstering had a prejudicial impact that led to his convictions. We disagree. Although the State's argument created an unfair risk that Young's testimony would bolster Manrriquez's testimony, this risk was minimal: the State made only one reference to the statements in its closing argument; the substance of the statements implied, at most, that Manrriquez merely believed defendant was going to hit her; and defendant had ample opportunity to attack Manrriquez's credibility. No reasonable jury would have rendered a different verdict based solely on the State's improper use of the statements, thus the error was

harmless.

¶ 75                          III. CONCLUSION

¶ 76    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 77    Affirmed.